IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                             21-cr-0394 RB

ISAAC RAYMOND RODRIGUEZ,

    Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## DENYING DEFENDANT'S MOTION TO SUPPRESS

This matter comes before the Court on Defendant's Motion to Suppress Evidence and Statements. (Doc. 25.) Having reviewed the briefs and documentary evidence, hearing testimony, and being otherwise fully advised, the Court will deny the motion.

**I.    Procedural Posture and Background**

The Indictment charges Defendant with transporting illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). (Doc. 19.) On April 6, 2021, Defendant "move[d] to suppress all evidence and statements obtained as a result of the unlawful stop of his vehicle on October 7, 2020, on Highway 80 north of Rodeo, New Mexico" on the basis that a reasonable officer would not have suspected the vehicle of being involved in criminal activity. (Doc. 25 at 1, 5.) The Government argues that, given the totality of the circumstances, it was reasonable for the agent to stop Defendant's vehicle on suspicion of criminal activity. (*See* Doc. 28.) The Court held a hearing on July 7, 2021. (Doc. 41.)

**II.    Factual Findings**

Rule 12(d) of the Federal Rules of Criminal Procedure provides that when factual issues are involved in deciding a motion, the Court must state its essential findings on the record. *See*

1

Fed. R. Crim. P 12(d). The Court makes the following factual findings based on the evidence in the record and evidence adduced at the hearings. At the July 7, 2021 hearing, the Court heard testimony from United States Border Patrol Agent Demetrios Campbell.[1]

On October 7, 2020, at approximately 8:50 P.M., Agent Campbell was patrolling Highway 80, north of Rodeo, New Mexico. (Docs. 1 at 1; 28 at 2; Unofficial Tr. of July 7, 2021 Hr'g (Tr.) at 14.) While driving southbound, he received a "Be On the Look Out" ("BOLO") for a gray SUV suspected of trafficking contraband or undocumented aliens across the international border. (Doc. 1 at 1.) At approximately 8:55 P.M., Agent Campbell observed an SUV driving northbound on Highway 80.[2] (*Id.*) As the vehicle appeared to match the BOLO and was the only vehicle Agent Campbell had seen in 30 minutes, he decided to follow it. (*Id.* at 2.) While following the vehicle, he observed that it was a Jeep Grand Cherokee with an Arizona license plate. (*Id.*) It was covered in dust, had dark tinted windows, and a closer look revealed that there was a single handprint visible on the back windshield. (*Id.*) Upon gathering this information, Agent Campbell requested the registration information of the vehicle and discovered that the vehicle was a gold Jeep Grand Cherokee registered to a resident of Duncan, Arizona. (*Id.* at 2; Tr. at 18, 25.) After following the vehicle for some time, the SUV began to cross the center line, which caused Agent Campbell to think the driver was watching him closely. (Doc. 28 at 11; Tr. at 16.) Considering all these factors, Agent Campbell suspected the driver of smuggling either contraband or illegal aliens. (Doc. 28 at 11; Tr. at 24.) He then activated his emergency lights and siren and pulled the vehicle over. (Tr. at

---

[1] The Court cites herein to the Court Reporter's original, unedited, and unfiled version of the July 7, 2021 hearing transcript. (Tr.) Any finalized transcript may contain different page numbers. The Court also cites to Government Exhibits introduced at the July 7, 2021 hearing.

[2] Agent Campbell testified that the SUV looked dark, dirty, and gray. (Tr. at 23.) He explained that at night, he looks for one of three colors: "if the description for a BOLO comes out as a 'white' vehicle, [he looks] for a light-colored vehicle. If it comes in as 'black,' [he looks] for a dark-colored vehicle. If it's 'gray,' [he looks] for something in between." (*Id.*)

19.)

As Agent Campbell approached the vehicle, he shined his light into the vehicle and saw two subjects laying prostrate in the rear cargo area, three subjects sitting upright in the back seat, and a driver and passenger in the front two seats. (Doc. 28 at 4; Tr. at 21, 24.) Agent Campbell noticed that the passengers were "crammed into" the vehicle "without concern for their safety. They were not wearing seatbelts. The passengers in the cargo area were laying down . . . [without] pillows or luggage of any kind to show that they were . . . on a road trip of some sort." (Tr. at 24.) Agent Campbell asked the driver if he was a U.S. Citizen. (*Id.* at 22.) The driver replied, "Yes," with an American accent. (*Id.*) He asked the front passenger the same question and received the same answer but with a foreign accent. (*Id.*) Agent Campbell then approached the passenger's open window and smelled strong body odor and desert vegetation, "which is a scent unique to people . . . that have been walking through the desert, such as with alien smuggling attempts." (*Id.*) The rear passengers did not speak English, but readily admitted in Spanish that they were not U.S. Citizens and did not possess the appropriate documentation to be in the United States legally. (*Id.*) Following these confessions, the front passenger admitted that he was also an undocumented alien. (*Id.*)

At this point, Agent Campbell suspected that the driver, later identified as Rodriguez, was transporting aliens for profit. (Doc. 1 at 2.) At approximately 9:00 P.M., Agent Campbell arrested Rodriguez for transporting the six subjects in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I). (*See id.*) Agent Campbell read Rodriguez his Miranda rights in English, and then all subjects and the vehicle were transported to the Lordsburg Border Patrol Station for additional investigation. (*Id.*) At the Station, agents conducted a post-Miranda interview with Rodriguez. (*Id.*) Prior to questioning, Rodriguez was advised of his rights, and he

acknowledged that he understood them and was willing to answer questions without the presence of an attorney. (*Id.*) Rodriguez subsequently admitted that he was hired to do the job by a friend and expected to receive a payment of approximately $1,500 to $1,600. (*Id.*)

## III. Legal Standards

### A. Motion to Suppress

In deciding this Motion to Suppress Evidence and Statements the Court "must assess the credibility of witnesses and determine the weight to give to the evidence presented . . . ." *United States v. Goebel*, 959 F.3d 1259, 1265 (10th Cir. 2020) (citations omitted). Any "inferences the district court draws from that evidence and testimony are entirely within its discretion." *Id.* (citations omitted).

"To successfully suppress evidence as the fruit of an unlawful detention, a defendant must first establish that the detention did violate his Fourth Amendment rights." *United States v. Nava-Ramirez*, 210 F.3d 1128, 1131 (10th Cir. 2000) (citation omitted). Once a defendant establishes that violation, "[t]he defendant then bears the burden of demonstrating 'a factual nexus between the illegality and the challenged evidence.'" *Id.* (quotation omitted). "Only if the defendant has made these two showings must the government prove that the evidence sought to be suppressed is not 'fruit of the poisonous tree,' either by demonstrating the evidence would have been inevitably discovered, was discovered through independent means, or was so attenuated from the illegality as to dissipate the taint of the unlawful conduct." *Id.* (citations omitted). The Court notes that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence." *United States v. Matlock*, 415 U.S. 164, 177 n.14 (1974) (citation omitted).

## B. Reasonable Suspicion

The Fourth Amendment safeguards "[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[I]ts protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Quintana-Garcia*, 343 F.3d 1266, 1270 (10th Cir. 2003) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Officers may, however, "stop and briefly detain a person for investigative purposes if the officer has reasonable suspicion . . . that criminal activity 'may be afoot . . . .'" *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry v. Ohio*, 392 U.S. 1, 30 (1968)). "Reasonable suspicion" is a "minimal level of objective justification[,]" which is "something more than an 'inchoate and unparticularized suspicion or hunch.'" *Id.* (quotations and quotation marks omitted). Reasonable suspicion does "not rise to the level required for probable cause, and it falls considerably short of satisfying a preponderance of the evidence standard." *Arvizu*, 534 U.S. at 274 (citing *Sokolow*, 490 U.S. at 7). Rather, reasonable suspicion is a "minimal level of objective justification which the officers can articulate . . . ." *United States v. Valles*, 292 F.3d 678, 680 (10th Cir. 2002) (quotation omitted). Notably, "[a] factor may contribute to reasonable suspicion even if it 'is not by itself proof of any illegal conduct and is quite consistent with innocent travel.'" *Id.* (quoting *Sokolow,* 490 U.S. at 9).

"Border Patrol Agents on roving patrol [may] . . . 'stop vehicles only if they are aware of specific articulable facts, together with rational inferences from those facts, that reasonably warrant suspicion' that the occupants are involved in criminal activity." *United States v. Cheromiah*, 455 F.3d 1216, 1220 (10th Cir. 2006) (quoting *United States v. Cantu*, 87 F.3d 1118, 1121 (10th Cir. 1996)). The Supreme Court has explained that "[a]ny number of factors may be

taken into account in deciding whether there is reasonable suspicion to stop a car in the border area[,]" *United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975), and it has provided a non-exhaustive list of circumstances that may give rise to reasonable suspicion:

> (1) [the] characteristics of the area in which the vehicle is encountered; (2) the proximity of the area to the border; (3) the usual patterns of traffic on the particular road; (4) the previous experience of the agent with alien traffic; (5) information about recent illegal border crossings in the area; (6) the driver's behavior, including any obvious attempts to evade officers; (7) aspects of the vehicle, such as a station wagon with concealed compartments; and (8) the appearance that the vehicle is heavily loaded.

*United States v. Gandara-Salinas*, 327 F.3d 1127, 1130 (10th Cir. 2003) (citing *United States v. Monsisvais*, 907 F.2d 987, 990 (10th Cir. 1990); *Brignoni-Ponce*, 422 U.S. at 884–85). "In determining whether a roving border patrol agent had reasonable suspicion to stop a vehicle, [courts] look at the totality of the circumstances, or, in other words, 'the whole picture.'" *Cantu*, 87 F.3d at 1121 (quoting *United States v. Cortez*, 449 U.S. 411, 417 (1981)). "A proper examination of the totality of the circumstances must recognize that 'individual factors that may appear innocent in isolation may constitute suspicious behavior when aggregated together.'" *United States v. Madrid-Vega*, No. 2:06CR2487, 2007 WL 9734226, at *3 (D.N.M. Mar. 6, 2007) (quoting *United States v. Diaz-Juarez*, 299 F.3d 1138, 1141 (9th Cir. 2002)).

IV. **Analysis under the *Brignoni-Ponce* Factors**

    A. **Characteristics of the Area**

Agent Campbell testified that New Mexico "Highway 80 is a notorious [corridor] out from the border for smuggling, . . . as it's the only paved road that leaves that southeastern Arizona/southwestern New Mexico are that does not have continuous monitoring by Border Patrol through a checkpoint." (Tr. at 10.) *See also United States v. Cortez*, 965 F.3d 827, 835 (10th Cir. 2020), *cert. denied*, 141 S. Ct. 1250, 208 (2021) (finding that "[t]his particular road [New Mexico Highway 80] adds to the reasonableness of suspicion"); *see also United States v.*

*Westhoven*, 562 F. App'x 726, 728 (10th Cir. 2014) (relying on testimony that "undocumented immigrant and drug smugglers used [Highway 80 in southern New Mexico] heavily due to the lack of border patrol checkpoints" in finding reasonable suspicion existed); Agent Campbell has personally "interdicted dozens of alien smuggling attempts in and around Rodeo, New Mexico[,]" a "small village" on Highway 80. (Tr. at 10, 12; *see also* Gov't Ex. 2.) The highway is also close to "two mountain ranges, the Chiricahua mountains and the Peloncillo mountains, which are able to conceal a lot of foot traffic coming from the border and provides some cover for those smuggling organizations to load out onto Highway 80." (*Id.* at 10.) This area of the highway is remote and "sparsely populated[,]" with "some houses around the actual town of Rodeo, but otherwise it's open grassland and ranch land in the valley[,]" the nearest business being three to four miles south. (*See id.* at 15, 20–21, 33.)

### B. Proximity to the Border

Agent Campbell stopped Rodriguez's vehicle approximately 50 miles from the U.S./Mexico border. (*Id.* at 12.) *See also Cheromiah*, 455 F.3d at 1221 (finding that a stop of a "van only 85 miles from the border in an area frequented by smugglers" was permitted); *Quintana-Garcia*, 343 F.3d at 1272 (50 to 60 miles from the border); *United States v. Barron-Cabrera*, 119 F.3d 1454, 1458 n.4, 1460 (10th Cir. 1997) (45 miles from the border); *United States v. Lopez-Martinez*, 25 F.3d 1481, 1485 (10th Cir. 1994) (60 miles from the border); *United States v. Venzor-Castillo*, 991 F.2d 634, 635, 639 (10th Cir. 1993) (no reasonable suspicion when stop was conducted 235 miles from border).

### C. Traffic Patterns

Highway 80 begins in Douglas, Arizona, near the Mexico/Arizona border, runs northeast before crossing into New Mexico, and ultimately ends at I-10, six miles east of the New Mexico/Arizona border. (*See* Tr. at 6.) *See also United States v. Milne*, No. CR 17-1923 RB, 2017

WL 4675745, at *1 (D.N.M. Oct. 16, 2017), *aff'd*, 757 F. App'x 739 (10th Cir. 2018) ("Highway 80 originates in Douglas, Arizona, a border town, and runs north-south, ending after it merges into Interstate 10 in New Mexico."). Highway 80 is unlike other major roadways in the area, in that it does not have a U.S. Border Patrol Checkpoint. (*See* Tr. at 10.) *See also Milne*, 2017 WL 4675745, at *1. Agent Campbell testified that the vehicle's "registration came back to Duncan, Arizona, which is a town that's over 80 miles north of the area [they] were in[ a]nd not on a direct route." (Tr. at 18.) He further testified that "[a]s a Border Patrol agent in the Lordsburg area," he does not "typically encounter people from the Duncan area . . . ." (*Id.* at 19.)

### D. Agent's Experience with Immigrant Traffic

Agent Campbell testified that he has been a Border Patrol Agent for 14 years and has "received continuing training since that time[,]" including "various pipeline and smuggling interdiction trainings . . . ." (*Id.* at 4.) *See also Barron-Cabrera*, 119 F.3d at 1460–61 (finding that the Border Patrol Agent "established sufficient previous experience with alien traffic to satisfy the fourth prong of the *Brignoni–Ponce* test" given that the agent had "been a Border Patrol agent for 3 ½ years"). He has also been an instructor for courses on "roadside interview and search techniques . . . ." (Tr. at 4.) Agent Campbell has been at his current duty station for approximately nine years. (*Id.*) His "primary duty is to detect and apprehend subjects who have crossed the border illegally" and to "interdict[] contraband smuggling loads . . . ." (*Id.* at 5.)

### E. Information About Recent Border Crossing

Agent Campbell testified that in the week leading up to the incident here, "agents at [his] station had interdicted . . . eight" alien smuggling attempts. (*Id.* at 13.) He had personally been involved in interdicting several of those attempts. (*See id.*)

8

### F. The Driver's Behavior

Agent Campbell testified that the driver of the SUV "was going exactly the speed limit . . . ." (*Id.* at 15.) He noticed that after he began following Rodriguez's vehicle, it started to drift over the center line of the highway. (*Id*. at 16.) Agent Campbell stated that this behavior caused him to believe Rodriguez was carefully watching Agent Campbell's vehicle approach him. (*Id*.) Although the Government argues that this behavior could be indicative "of guilt and fear of being arrested" (Doc. 28 at 11), the Court discounts this conclusion to some extent as Agent Campbell was driving an unmarked law enforcement vehicle. (*See* Tr. at 16.)

### G. Aspects of the Vehicle

Agent Campbell did not recognize the SUV as a local vehicle. (*Id.*) The SUV was gold but was covered with a fine layer of dust. (*See id.* at 15; *see also* Ex. 4.) He also observed a visible handprint on the vehicle's back windshield. (*Id.* at 17.) That the SUV was covered in dust with a handprint on the trunk was significant to Agent Campbell, because it caused him to believe that the driver had "driven on a dirt road [and] at some point the tailgate had to have been opened and then once something was put inside, somebody closed that tailgate with two hands." (*Id.*) Because the handprint was on the driver's side, that indicated the driver was complicit, if it was a smuggling load. (*Id.*)

Agent Campbell testified that while having an Arizona license plate is not suspicious by itself, the combination of facts here aroused his suspicion. (*Id.* at 27–28.) That is, the vehicle was an SUV with an Arizona plate, driving north in the dark, and covered in dust with a visible handprint. (*Id.* at 27–28.) *See also Westhoven*, 562 F. App'x at 731 (among other things, tinted windows, out-of-state plates, and driving approximately 45 miles from the border on Highway 80 caused the court to conclude that the agent had reasonable suspicion).

9

### H. The Appearance that the Vehicle Was Heavily Loaded

With respect to the last *Brignoni-Ponce* factor, whether the vehicle appeared to be heavily loaded, Agent Campbell testified that the vehicle "did not appear to be so heavily laden that it was [compressing] the suspension." (Tr. at 18.)

### I. Summary of the *Brignoni-Ponce* Factors

Under the first reasonable suspicion factor, characteristics of the area, Agent Campbell knew Highway 80 to be a highly trafficked route for drug and human smugglers. *See Gandara-Salinas*, 327 F.3d at 1129–30. Under factor two, proximity to the border, Agent Campbell encountered the SUV driving north on Highway 80 approximately 50 miles from the border. *See id.* at 1230. Under the third factor, traffic patterns, Highway 80 begins in Douglas, Arizona, near the Mexico/Arizona border and runs northeast before crossing into New Mexico, where it ultimately ends at I-10, six miles east of the New Mexico/Arizona border. Relevant to factors four and five—the agent's previous experience with immigrant traffic and information about recent border crossings, Agent Campbell testified regarding Highway 80's reputation as a highly trafficked route for human smuggling, and his own station's recent experience with immigrant smugglers in the week leading up to the incident here. Under factor six, the driver's behavior, Agent Campbell testified that Rodriguez drove exactly the speed limit and drifted over the center line of the two-lane highway, which caused him to think that the driver was nervously watching his approaching vehicle, instead of the road ahead. As to factor seven, the appearance of the vehicle, Rodriguez's vehicle was covered with a fine layer of dust, which caused Agent Campbell to think there was a recent off-road border incursion. Further, Agent Campbell saw a visible handprint on the trunk of the SUV, which caused him to think that a possible loading of individuals had taken place. Finally, he described the totality of the circumstances: the SUV with out-of-state

plates, the time and direction of travel, and the dust on the car, aroused his suspicion. *See Westhoven*, 562 F. App'x at 731. Factor seven, the appearance of the car being weighed down, did not factor into Agent Campbell's reasonable suspicion analysis.

## V.     The Totality of the Circumstances Justified the Stop

If one views the facts and the relevant *Brignoni-Ponce* factors in isolation, Rodriguez's October 7, 2020 travel on Highway 80 may appear innocent, as he proposes. Viewing the facts and the relevant *Brignoni-Ponce* factors under a totality of the circumstances standard as described above, Agent Campbell was aware of specific articulable facts from which a Border Patrol Agent with his extensive experience and training in the Lordsburg area could make reasonable inferences warranting a reasonable suspicion that the driver of the gold Jeep Grand Cherokee was transporting contraband, whether illegal aliens or other contraband. *See Cheromiah*, 455 F.3d at 1221 (observing that court "may not engage in a 'sort of divide-and-conquer analysis' by evaluating and rejecting each [*Brignoni-Ponce*] factor in isolation") (citation omitted).

Rodriguez emphasizes the BOLO description and the fact that Highway 80 is the most direct route from Douglas to Duncan. (*See* Doc. 25 at 5–6.) The Court finds, though, that under the circumstances, it was reasonable for Agent Campbell to believe that the Jeep matched the BOLO description. A Jeep is an SUV, and while it was gold instead of gray (as described in the BOLO), Agent Campbell explained that because it was dark[3] and the vehicle was covered in dust, it was difficult to discern the vehicle's color. The Government's exhibit of the photo confirms that in the dark, it would be difficult to tell whether the SUV is gold or gray. (*See* Ex. 4.) Together with Agent Campbell's testimony regarding his experience with interdictions along that highway and

---

[3] In New Mexico, at that time of the year (October), it is dark by 9:00 P.M. *See Sunrise and sunset times in Rodeo, Hidalgo County, New Mexico, 88056, USA*, SUNRISE-SUNSET.ORG, https://sunrise-sunset.org (last visited July 10, 2021) (stating that the sunset took place at 6:52 P.M. on October 7, 2020).

the fact that smugglers often travel in the evening, the Court finds that there was reasonable suspicion to stop Rodriguez.

Rodriguez also attempts to negate the significance of traveling on Highway 80.[4] (*See* Doc. 25 at 5) ("Although the fact the Jeep was seen on a route known for alien and drug smuggling, merely driving in such an area is not enough to create reasonable suspicion[,]" because "Highway 80 is the most direct route from Douglas, Arizona, to Duncan, Arizona . . . ."). On the contrary, given that the road is a notorious smuggler's route that avoids checkpoints, together with Agent Campbell's knowledge of the local traffic, the recent BOLO, and the fact that he had not seen any other vehicles for roughly 30 minutes, it was reasonable to suspect that the vehicle was in the process of conducting illegal activity. Thus, under the factors articulated in *Brignoni-Ponce*, the Court finds that Agent Campbell had the requisite reasonable suspicion to stop the vehicle to investigate a potential human trafficking offense. *See Valles*, 292 F.3d at 680 (reasonable suspicion is a "minimal level of objective justification which the officers can articulate"). Accordingly, the Court will deny Rodriguez's motion.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence and Statements (Doc. 25) is **DENIED.**

_____
ROBERT C. BRACK
SENIOR U.S. DISTRICT JUDGE

---

[4] Rodriguez also contends that the vehicle being dusty and having tinted windows "is not unusual or suspicious . . . ." (Doc. 25 at 6.) Though in isolation these facts might not cause concern, they reasonably added to Agent Campbell's suspicion under the totality of the circumstances.